FILED
CLERK
2/14/2020 1:55 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
MICHAEL CASON

                  Plaintiff,

      -against-

FEDERAL PROTECTIVE SERVICE
OFFICERS JOHN DOE 1-2, FJC SECURITY
SERVICES INC., FJC SUPERVISOR SMITH,
JOSHUA PRIMROSE AND STEPHANIE
STEVENS,

                  Defendants.
----------------------------------------------------------X

**MEMORANDUM OF DECISION & ORDER**
2:16-cv-3710 (ADS) (ARL)

**APPEARANCES:**

**The Law Office of Tamara M. Harris**
*Attorneys for the Plaintiff*
111 Broadway, Suite 706
New York, NY 10006
    By:    Tamara M. Harris, Esq., Of Counsel.

**Crowell & Moring LLP**
*Attorneys for the Defendants*
590 Madison Avenue
New York, NY 10022
    By:    Eric Su, Esq., Of Counsel.

**United States Attorneys Office, Eastern District of New York**
*Attorneys for Defendants Federal Protective Service Officers John Doe 1-2*
610 Federal Plaza
Central Islip, NY 11722
    By:    Robert W. Schumacher II, Esq., Assistant United States Attorney.

**FordHarrison LLP**
*Attorneys for Defendants FJC Security Services Inc., FJC Supervisor Smith, Joshua Primrose, and Stephanie Stevens*
60 E 42nd Street, 51st Fl.
New York, NY 10165
    By:    Saima Zuberi Sheikh, Esq.,
            Elliot Dov Buckman, Esq.,
            Philip K. Davidoff, Esq., Of Counsel.

**SPATT, District Judge**:

The case involves two intertwined entities, Federal Protective Services ("FPS") and FJC Security Services, Inc. ("FJC"). These entities are distinguishable as follows. FPS is the uniformed security police division of the United States Department of Homeland Security, and it guards federal facilities. FJC is a security company that contracts with FPS to guard federal facilities.

Plaintiff Michael Cason (the "Plaintiff") brought this action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971); a state law claim for false imprisonment; and a whistleblower claim under §§ 740 and 741 of the New York Labor Law ("NYLL"). The action is against (1) two unnamed employees of FPS (the "FPS John Doe Defendants"); (2) FJC; and (3) three of FJC's employees, Lieutenant Ivanhoe Smith ("Smith"), Joshua Primrose ("Primrose"), and Stephanie Stevens ("Stevens") (collectively, and along with FJC, the " FJC Defendants").

The Plaintiff, a former FJC employee, was terminated for failing to safeguard his firearm during a protest about workplace safety. The FJC Defendants now move under Federal Rule of Civil Procedure ("FED. R. CIV. P.") 56 for summary judgment and to dismiss the complaint against them. In his opposition, the Plaintiff asks to amend the caption to identify the FPS John Doe Defendants.

This action involves a complicated factual and procedural history. Accordingly, this opinion's background section describes both in detail. In the discussion section, the Court grants the FJC Defendants' summary judgment motion and dismisses the complaint as to the FJC Defendants, including FJC itself. It also grants the motion to amend the caption. The case will proceed as against the now-identified FPS Defendants.

**I. BACKGROUND**

Part of this action's procedural history is an ongoing dispute over the Local Rule 56.1 statements of facts. After the FJC Defendants filed their Rule 56.1 statement in December 2017, the Plaintiff failed to file his counterstatement, despite numerous inquiries from the FJC Defendants and United States Magistrate Judge Arlene L. Lindsay. In August 2018, the FJC Defendants moved for the Court to deem as admitted the facts contained in their Rule 56.1 Statement, and only at that point did the Plaintiff file a Rule 56.1 counterstatement. The Court granted that motion, and rejected the Plaintiff's Rule 56.1 counterstatement. ECF 66 at 4.

Accordingly, the Court draws the following facts from the FJC Defendants' Rule 56.1 statement.

**A. The Relationship Between the Parties and the Plaintiff's Employment History**

The Plaintiff began working for FJC as an armed security guard in October 2013. He worked in that capacity at 201 Varick Street from that date until his July 2015 termination. His supervisor was Smith, a lieutenant with FJC. Defendants Stevens and Primrose were FJC administrators. Stevens is FJC's senior director of financial services, and Primrose is FJC's Vice President of federal services.

Prior to working for FJC, the Plaintiff had worked as an armed security guard for multiple companies; as a corrections officer for the New York City Department of Corrections; and as a police officer for the New York City Police Department ("NYPD"). In those positions, the Plaintiff was required to carry a firearm.

The Plaintiff's 2013 application to work at FJC emphasized the use and storage of firearms. The Plaintiff completed an NYPD handgun license application, where he stated that when his handgun was not in use it would be "[a]t my residence in a lock box with a

3

combination lock." The Plaintiff also completed an NYPD pistol license application, where he noted that "[f]ailure to comply with the rules and regulations of the New York City Police Department License Division . . . will result in cancellation of all pistol permits issued to employees of the company." The Plaintiff signed an Affidavit of Familiarity with Rules and Law, where he swore that he would be responsible for knowledge of and compliance with all federal, state, and local rules with regard to his firearms license.

Upon his hiring with FJC, the Plaintiff signed additional documents pertaining to firearms. First, he signed a form stating that he understood that his employment was contingent upon his complying with FJC regulations. Second, he signed an FJC document entitled "Firearms Acknowledgement," which provided that FJC had issued to him a .40 caliber firearm. In the Firearms Acknowledgement, the Plaintiff agreed that he was responsible for the maintenance, custody, and control of the firearm; that he would comply with all federal, state, and local regulations regarding the firearm's possession and use; that he would only carry the firearm during his course of duty with FJC; that he was prohibited from carrying an FJC-issued weapon otherwise, with the exception of when he was going to or returning from work; and, that noncompliance would constitute grounds for disciplinary action, including termination. The FJC Defendants also note that Title 38, Chapter 5, Subchapter B, § 5-22 of the New York City Rules ("RCNY") prevents a licensee leaving a handgun in an automobile without first rendering it inoperable by employing a safety locking device, and § 5-24 provides that a licensee shall not unreasonably delay in returning from employment to his residence.

Notwithstanding this background, the Plaintiff testified that he had no knowledge of federal, state, or local regulations regarding the safeguarding, handling, or maintaining of a firearm. He also testified that: (a) he was aware of a New York City rule prohibiting him from

4

an unreasonable delay in traveling with his firearm from his place of employment to his home; (b) the totality of his knowledge concerning firearm safety was that he needed to ensure that he neither discharged the weapon or shot anyone; (c) he needed to prevent his firearm from being stolen; and (d) the Firearms Acknowledgement's "custody and control" provision mandated that he "control [his] thoughts and [his] actions by not hurting anyone with that gun" and that he "maintain a level head [in] dealing with that gun."

The Plaintiff was issued a restricted concealed carry handgun license in September 2013. The license states that the "[h]andgun may be carried ONLY when actively engaged in employment and to & from residence to employment." On September 22, 2013, the Plaintiff received a copy of the FJC employee handbook and he acknowledged receipt and his responsibility to familiarize himself with its provisions. While working for FJC, the Plaintiff needed to complete firearms training at least twice a year.

### B. The Incident at 201 Varick Street

During his time at FJC, the Plaintiff submitted written complaints about his pay, and he would make complaints by telephone about workplace safety. Although the Plaintiff testified that he first became concerned with workplace safety in 2013, he did not complain to Defendants Stevens or Primrose about safety until 2015.

On July 3, 2015, the Plaintiff drove to his 8:00 AM–4:00 PM shift at 201 Varick Street. He parked his car on King Street, directly across the street from 201 Varick Street. After his shift ended, he planned to protest workplace pay and safety. He returned to his car; placed his firearm in the trunk; removed a sign from his car reading "FJC SECURITY PAY ME MY MONEY" and also containing additional statements that having a skeleton crew at 201 Varick

Street was dangerous to FJC employees; and then held the sign outside of the front of 201 Varick Street for ten to fifteen minutes.

On that day, Smith was working for FJC as a "roving supervisor." He was called to the site of the Plaintiff's protest because the protest was drawing attention, and "[a]nything that draws attention [to a federal facility] requires a supervisor." Smith arrived at the scene and saw the Plaintiff walking around; holding a sign; and yelling "pay me my money." Smith photographed the Plaintiff and sent the image to Stevens; called Stevens to report the Plaintiff's protest; and told Stevens that the impetus for the protest was the Plaintiff's claims that he hadn't been paid. Stevens did not ask Smith to stop the Plaintiff from protesting.

Smith testified that he followed FPS protocol and called the FPS "Mega Center" to report the protest. Four FPS officers arrived at 201 Varick Street. Because FPS officers are responsible for handling investigations, and the government does not consider FJC employees to be law enforcement personnel, Smith's only responsibility was being ready if needed. One FPS officer asked Smith if the Plaintiff had his firearm. Smith replied that the officer would have to ask the Plaintiff, and added that the Plaintiff had a carry license and that FJC procedure required him to have his firearm on his person at all times when traveling to and from work.

The Plaintiff walked to his car with the FPS officers. When they arrived at the car, Smith was standing at the opposite side of the street. The Plaintiff told the FPS officers that his firearm was in his car's trunk. The Plaintiff opened the trunk, which revealed his firearm in his holster. After the officers inspected the firearm, the Plaintiff retained possession and he returned home.

### C. The Incident's Aftermath and the Plaintiff's Termination

While the Plaintiff was driving home, Stevens called the Plaintiff to address his payroll concerns, and informed the Plaintiff that he had been administratively suspended from work,

pending an investigation. Stevens stated that the Plaintiff's improper safeguarding of his firearm caused the suspension. Stevens asked the Plaintiff not to protest while he looked into the payroll issues.

Stevens then spoke with Primrose about the protests. He also received a call from an FPS officer, who was concerned about the Plaintiff's leaving his firearm in his trunk and not properly safeguarded.

That same evening FJC's gun custodian Bill McKinney ("McKinney") called the Plaintiff to advise him that he needed to surrender his firearm. The two met near the Plaintiff's home and the Plaintiff surrendered his firearm and his firearms license. The Plaintiff also told McKinney that he would leave his firearm in his trunk when visiting his mother's home, although he had been told not to do so.

The following day, July 4, 2015, the Plaintiff returned to 201 Varick Street to continue his protest. During that protest, the Plaintiff spoke with Primrose by telephone. Primrose asked the Plaintiff to leave because he felt that the image of an FJC officer protesting made it appear as if "the offices at a given location do not constitute a professional security force." He also informed the Plaintiff that in picketing, he was violating the FJC collective bargaining agreement ("CBA"), an act that could result in discharge. During this conversation, the Plaintiff called Primrose a racist, and referred to FJC "as a nameless, faceless organization that did not care about its employees," including the Plaintiff, who is African American. Primrose then investigated the Plaintiff's payroll concerns, and in the following week he made sure that the Plaintiff received the sums owed to him.

The Plaintiff did not return to 201 Varick Street to protest. On July 7, 2015, Primrose held an informal meeting to discuss FJC officers' problems and concerns. No FJC officer raised

7

a concern about safety. Primrose again told the Plaintiff that continued picketing violated the CBA.

FJC notified the NYPD about the Plaintiff's protest, and one week after the July 3 protest, the NYPD suspended the Plaintiff's firearms license. Stevens testified that upon the suspension of his license, FJC determined that the Plaintiff should be terminated for failure to properly safeguard his firearm. FJC notified the United States Department of Homeland Security of the Plaintiff's termination, advising that the Plaintiff's failure to safeguard his firearm caused his termination. By letter dated August 13, 2015, FJC memorialized the Plaintiff's termination, citing "policy/procedure violations." Primrose testified that the ultimate decision to terminate the Plaintiff came from his violation of numerous company policies and the rules of the City of New York with regard to handling a firearm, and from the Plaintiff's violation of these policies and rules despite his knowledge of them. He also testified that the Plaintiff's picketing had nothing to do with his subsequent termination.

### D. The Present Action and Procedural History

The Plaintiff brought this action in July 2016, raising causes of action under *Bivens* and state law. As to *Bivens*, the Plaintiff contended that the FPS John Doe Defendants violated his Fourteenth Amendment liberty right; his Fourth Amendment right against unlawful searches and seizures; and his First Amendment Right to free speech. ECF 1 at 1–9. Also as to *Bivens*, the Plaintiff alleged that FJC and Smith unlawfully imprisoned him. As to state law, the Plaintiff alleged that FJC Defendants, with the exception of Smith, violated New York's whistleblower statute, N.Y. Labor Law ("NYLL") §§ 740–41, in that they retaliated against him for disclosing workplace safety issues, namely, the dangers of reducing the number of officers guarding 201

Varick Street after 4:00 pm. *Id.* at 10–11 The Plaintiff asked for $20.1 million in damages and fees against each Defendant for each cause of action. *Id.* at 11–12.

Presently before the Court is the FJC Defendants' FED. R. CIV. P. 56 motion for summary judgment. Also before the Court is the Plaintiff's FED. R. CIV. P. 15(a) motion to amend the caption, which he raises in his opposition to the summary judgment motion. The Court will address each of those motions in turn.

## II. DISCUSSION

### A. The Legal Standard

Rule 56(a) provides that a court may grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"A genuine issue of fact means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Wright v. Goord*, 554 F. 3d 255, 266 (2d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "The evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Wright*, 554 F.3d at 266 (parenthetically quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). However, to defeat a motion for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts," and the party "may not rely on

conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal quotation marks omitted).

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### B. Application to the Facts of This Case

The FJC Defendants move for summary judgment and dismissal of the complaint as to them. They contend that the Plaintiff has not asserted a viable *Bivens* claim against them because the *Bivens* section of his complaint only raised claims against the FPS John Doe Defendants. ECF 77-10 at 13–14. Had he pleaded those claims against the FJC Defendants, they argue that the claims would nonetheless lack merit, because FJC is a private corporation operating under contract with the federal government, placing them beyond the ambit of a *Bivens* action. *Id.* at 14–15.

The FJC Defendants address the unlawful imprisonment claim separately. They argue that this claim fails because (a) Smith and FJC did not confine the Plaintiff; and (b) because any such confinement would have been privileged. As to (a), they argue that the undisputed facts demonstrate that the Plaintiff was not handcuffed by FPS officers; Smith did not take part in the July 3, 2015 investigation of the Plaintiff's firearm; Smith was not in a position to interfere with an investigation by government officers; the threat of termination from one's employment does not suffice for a false imprisonment claim; and, that even if Smith could be held liable for false imprisonment, FJC could not, because if Smith took part in a detention of the Plaintiff he would be acting outside the scope of his employment. *Id.* at 15–18. In particular, they note that

Stevens spoke with the Plaintiff, Smith, Primrose, and an FPS agent following the July 3, 2015 protest, and none of them mentioned the Plaintiff's being handcuffed. *Id.* at 16. Thus, they argue, "[i]t is near-impossible to believe" that all of those individuals would have omitted the handcuffing, had it occurred. *Id.* As to (b), they argue that any hypothetical detention would have been privileged because Smith had probable cause to detain the Plaintiff for failing to safeguard his firearm. *Id.* at 18–19. In the alternative,

The FJC Defendants also seek summary judgment as to the whistleblower claim. First, they allege that the Plaintiff cannot establish a *prima facie* claim of retaliation that he was terminated for protesting, because the undisputed facts show that he was fired for violating rules and procedures. *Id.* at 20. Second, they claim that the Plaintiff reported to FJC his concerns about improper staffing at 201 Varick Street. Thus, he raised an issue of a possible violation of the law that only affected FJC employees, and not the general public, meaning that he failed to establish actual proof of a violation of law. *Id.* at 20–22. Third, they contend that they had a legitimate, non-retaliatory reason to terminate the Plaintiff; "his extreme negligence in violating a host of rules and regulations." *Id.* at 22–25

In opposition, the Plaintiff does not raise any *Bivens* claims against the FJC Defendants. ECF 84. He expressly notes that he never raised a *Bivens* claim against any of them. *Id.* at 13. He only raises arguments as to his false imprisonment and whistleblower claims. As to the former, the Plaintiff contends that he testified that, on the day of his July 3, 2015 protest: (a) Smith told the Plaintiff that he was embarrassing FJC and that he was going to be handcuffed until he agreed to cease protesting safety issues; (b) Smith told an FPS officer to handcuff the Plaintiff; (c) Smith told the Plaintiff that he would not be released until he agreed to cease protesting; and (d) the Plaintiff had been handcuffed prior to the discovery of his firearm inside

11

his trunk, meaning there was no probable cause at the time he was detained. *Id.* at 5–7. Thus, the Plaintiff argues, there are genuine questions as to whether he was confined and whether his confinement was privileged. *See generally id.*

As to the latter, the Plaintiff claims that he has established a *prima facie* retaliation claim, because he testified that both Primrose and Smith told him that he could return to work until the resolution of the firearms issue if he ceased protesting. *Id.* at 10. The Plaintiff alleges that it was only after he refused to cease protesting that he was terminated. *Id* . He also alleges that following his termination, an individual shot and killed an FJC employee, which prompted the Occupational Safety and Health Administration to file a formal complaint against FJC for safety violations. *Id.* at 10–11. The Plaintiff claims that this occurrence was the very danger that he was protesting about. *Id.* The Plaintiff further contends that the FJC officer's death constituted an actual violation of the law, and that the Plaintiff's safety concerns were not only for himself, but for the general public, including "fellow officers, people entering the building and tenants therein." *Id.* at 11–12.

In their reply, the FJC Defendants argue that with regard to the false imprisonment claim, the Plaintiff asserts facts "directly rebutted by" the Rule 56.1 statement that the Court has deemed admitted, and that the only evidence offered by the Plaintiff is his own deposition testimony. ECF 89-3 at 2–3. They also assert that by the very act of protesting after work, the Plaintiff was violating his limited carry license and thus, probable cause existed to detain the Plaintiff. *Id.* at 5–6. In the alternative, they also argue that had Smith ordered the Plaintiff's arrest, he would have qualified immunity. *Id.* at 7. With regard to the whistleblower claim, the FJC Defendants argue that the death of the FJC worker and the subsequent OSHA investigation

does not constitute an actual violation of a specific safety regulation. *Id.* at 8–9. The Court addresses each of these issues in turn.

### 1. *Bivens*

As an initial matter, the parties agree that the Plaintiff ultimately did not raise a *Bivens* claim against any of the FJC Defendants. Accordingly, "no set of facts would entitle plaintiff to relief" against the FJC Defendants on a *Bivens* claim. *See Brown v. Quiniou*, No. 02-Civ-4630, 2003 WL 22509400, at *2 (S.D.N.Y. Nov. 4, 2003). In any event, a *Bivens* claim against the FJC Defendants would fail because none of them are government employees. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009) ("[A] plaintiff must plead that each Government-official defendant [in a *Bivens* action], through the official's own actions, has violated the Constitution."); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 378 (S.D.N.Y. 2011); *Cohen v. Holder*, No. 11-CV-0003, 2011 WL 809773, at *2 (E.D.N.Y. Mar. 1, 2011).

### 2. **False Imprisonment**

"'The elements of a claim for false arrest under New York law are that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Youngblood v. City of New York*, No. 15-CV-3541, 2019 WL 6216498, at *5 (S.D.N.Y. Nov. 21, 2019) (quoting *Sforza v. City of New York*, No. 07-CV-6122, 2009 WL 857496 (S.D.N.Y. Mar. 21, 2019); *see also Cartelli v. Cty. of Suffolk*, No. 15-CV-6890, 2019 WL 6875376, at *5 (E.D.N.Y. Dec. 17, 2019) (Spatt, *J.*). "To prove intent, a plaintiff must show that the defendant either: (a) confined or intended to confine the plaintiff or (b) affirmatively

procured or instigated the plaintiff's arrest." *King v. Crossland Sav. Bank*, 111 F.3d 251, 255 (2d Cir. 1997); *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 90 (E.D.N.Y. 2015).

The Court has already deemed admitted the facts in the FJC Defendants' Rule 56.1 Statement. This ruling, however, "'does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported by the record.'" *Dung Nguyen v. Morrison Healthcare*, 412 F. Supp. 3d 196, 198 n.1 (E.D.N.Y. 2018) (quoting *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)).

There is a question of fact as to whether the plaintiff was confined. The admitted statement of facts provides that when Stevens spoke with the Plaintiff, Primrose, Smith, and an FPS officer following the July 3, 2015 protest, she was never told that the Plaintiff had been handcuffed. ECF 77-4 at 15–16. The FJC Defendants cite deposition testimony from Smith, who witnessed the FPS officers' interaction with the Plaintiff, where he testified that he did not recall seeing the officers handcuff the Plaintiff. ECF 77-5 at 7. Notwithstanding their testimonial evidence, the Plaintiff has testified that he was handcuffed during this interaction, and that it was Smith who ordered the handcuffing. ECF 84-1 at 145–48.

However, the Plaintiff's claim fails on another false imprisonment ground; privilege. "'For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause.'" *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759, 47 N.E.3d 747 (2016)). An officer has probable cause when she has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has

committed or is committing a crime." *Id.* (citing *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999) (internal quotation marks omitted)).

Here, New York City rules prohibit an individual with a license to carry a firearm from unreasonable delay in returning home from his employment. 38 RCNY § 5-24 (stating that an individual violating this rule is also "in violation of license restrictions and the New York State Penal Law."). Accordingly, when Smith saw an FJC employee who carries a firearm engaging in a protest immediately after his shift ended, he had probable cause to believe that the Plaintiff was violating the New York City Rules, because he had unreasonably delayed his return to his home. Accordingly, there was probable cause to detain the Plaintiff, and the Court grants the summary judgment motion as to the false imprisonment claim.

### 3. The Whistleblower Claim

Section 740 of the NYLL prohibits employers from retaliating against any employee who "discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety." NYLL § 740(2)(a). To maintain an action under § 740, a plaintiff must: "'establish a violation of a law, rule or regulation, which information must be actual and not merely possible,' and (2) demonstrate 'that the lack of compliance presents a substantial and specific danger to the public health or safety.'" *Ulysse v. AAR Aircraft Component Servs.*, 841 F. Supp. 2d 659, 664 (E.D.N.Y. 2012) (Spatt, *J.*) (quoting *Perez v. Consol. Edison Corp. of N.Y.*, No. 02-Civ-2832, 2006 WL 2707316, at *16 (S.D.N.Y. Sept. 20, 2006) (internal quotation marks omitted)). An employee's reasonable, good faith belief that a violation has occurred is insufficient to invoke the statute's protection. *Tonra*

*v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 586 (S.D.N.Y. 2019) (citing *Khan v. State Univ. of N.Y. Health Science Ctr.*, 288 A.D.2d 350, 734 N.Y.S.2d 92, 94 (2001)).

The Court agrees with the FJC Defendants that the Plaintiff's claim fails on both prongs of this standard. First, in raising concerns about improper staffing, the Plaintiff did not identify any specific violations of the law. *See Calabro v. Nassau Univ. Med. Ctr.*, 424 F. Supp. 2d 465, 476 (E.D.N.Y. 2006) (collecting cases where parties "cited with particularity" purported violations of law); *see Freese v. Willa*, 89 A.D.3d 795, 796, 932 N.Y.S.2d 512, 513 (2d Dep't 2011) ("Contrary to the plaintiff's contention, she failed to plead a violation of any law, rule or regulation with the requisite particularity and specificity necessary to support a cause of action under Labor Law § 740.").

In addition, the Plaintiff also did not, in his complaint, claim that the safety issues about the number of FJC employees at 201 Varick Street in any way implicated the safety of the general public. Instead, his concerns pertained to that of himself and his fellow FJC employees. This is insufficient for meeting the second prong of the NYLL whistleblower statute. *See Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 355 (S.D.N.Y. 2017) ("[C]ourts have consistently held that the statute addresses only traditional public health and safety concerns.") (internal quotation marks omitted); *Schultz v. N. Am. Ins. Grp.*, 34 F. Supp. 2d 866, 869 (W.D.N.Y. 1999) (ruling that claims alleging fraudulent economic practices of a company do not constitute a danger to public health or society). Further, a whistleblowing claim based on insufficient pay is equally unavailing. *See Humphrey v. Rav Investigative & Sec. Servs. Ltd.*, 169 F. Supp. 3d 489, 500 (S.D.N.Y. 2016) (noting that a claim about insufficient pay "cannot maintain a claim under NYLL § 740").

The Court also rules that the FJC Defendants had a legitimate, non-retaliatory reason for firing the Plaintiff. They present evidence concerning the Plaintiff's employment history and use of firearms; his acknowledgement of the myriad local and state rules as well as company regulations concerning firearms; as well as his numerous violations of those rules and regulations. They also showed that the decision to terminate the Plaintiff came not on the day of the July 3, 2015 protest, but in the following week, after the NYPD had decided not to keep the Plaintiff's firearms license. The Plaintiff's arguments to the contrary again conflict with the statement of facts that this Court has deemed admitted. Thus, the Court grants the FJC Defendants' summary judgment motion with regard to the whistleblower claim. The Court also grants the FJC Defendants' summary judgment motion in its entirety, and the action is dismissed as against FJC, Smith, Primrose, and Stevens.

### C. Motion to Amend the Caption

In addition to opposing summary judgment, the Plaintiff moves under FED. R. CIV. P. 15(a)(2) to amend the caption of the complaint to identify the FPS John Doe Defendants as Officer Valentine; Commander Anest; Commander "QCity"; and Commander Hoff (aka Commander "Hog"). ECF 84 at 12. The Court provides the standard for a motion to amend the caption before granting that motion in the Plaintiff's favor.

#### 1. Legal Standard

FED. R. CIV. P. 15 requires the Court to "freely give leave" [to amend pleadings] when justice so requires. FED. R. CIV. P. 15(a)(2). In a *Bivens* claim, a plaintiff is required to identify a John Doe defendant and replace him with a named party within the three-year statute of limitations. *Arutyunyan v. Fed. Bureau of Investigation of New York State*, No. 17-CV-5009, 2018 WL 2972470, at *3 n.4 (E.D.N.Y. June 13, 2018); *Holmes v. Untied States*, No. 04-Civ-

7652, 2005 WL 2298159, at *1 n.2 (S.D.N.Y. Sept. 20, 2005) (citing *Tapia-Ortiz v. Doe*, 171 F. 3d 150, 151–52 (2d Cir. 1999)).

### 2. Application to the Facts of This Case

The Plaintiff alleges that when he filed the complaint, he did not know the names of the FPS officers he had named as defendants. ECF 84 at 12. He further alleges that since the case proceeded to discovery, he has learned through depositions the names of the FPS John Doe Defendants. *Id.* at 12–13.

The FJC Defendants do not oppose the motion to amend. ECF 89 at 14. However, they request that they be granted reasonable attorneys' fees arising from any further proceedings required by the requested amendment. *Id.* at 14–15. They make this request because FJC Defendant Smith referenced the names of the above-listed individuals in a December 2017 deposition, yet the Plaintiff is only now seeking to amend the caption. *Id.* at 15. They cite cases from other circuits in which Courts granted parties attorneys' fees in connection with motions to strike and dismiss amended complaints. *Id.*

The Court grants the motion to amend so that the Plaintiff may identify the purported violators of his constitutional rights; a necessity for a *Bivens* action. *See, e.g.*, *Arutyunyan*, 2018 WL 2972470, at *3 n.4. The Court acknowledges that one of the law firms representing the FJC Defendants, who are being dismissed from the action, also represents the FPS John Doe Defendants, and thus, it will continue to incur legal fees as the action proceeds. However, the Court need not award attorneys' fees at this time. The cases cited in support of the request for attorneys' fees discuss awards of attorneys' fees filed after a party had moved to either strike or dismiss an amended complaint. *See Medtronic, Inc. v. White*, 365 F. Supp. 2d 1105, 1119 (N.D. Cal. 2005); *O'Rear v. Am. Family Life Assur. Co.*, 139 F.R.D. 418, 421 (M.D. Fla. 1991). The

remaining Defendants may move for the attorneys' fees upon filing a dispositive motion later in this case.

## III. CONCLUSION

For the foregoing reasons, the Court grants the FJC Defendants' Rule 56 motion, and the complaint is dismissed as to them. The action shall proceed against the now-identified FPS Defendants. In addition, the Court grants the Plaintiff's motion to amend the caption. The Clerk of the Court is directed to amend the caption of the Complaint to add the following Defendants in lieu of the FPS John Doe Defendants: Officer Valentine; Commander Anest; Commander QCity; and Commander Hoff (aka Commander Hog).

The caption will read as follows:

MICHAEL CASON,

           Plaintiff,

-against-

FEDERAL PROTECTIVE SERVICE OFFICER VALENTINE, COMMANDER ANEST, COMMANDER QCITY, and COMMANDER HOFF (a/k/a COMMANDER HOG),

           Defendants.

It is **SO ORDERED.**

    /s/ Artur D. Spatt                                    February 14, 2020

   Arthur D. Spatt, U.S.D.J.                                         Date